**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JODIE E. SHULTZ<br>     Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 15-cv-03125 |
| STACEY L. LANDI; 25 W. HUBBARD, | ) | |
| INC., D/B/A, SOCIAL 25, j/s. | ) | Hon. Elaine E. Bucklo |
|      Defendants. | ) | |
| | ) | |

**DEFENDANTS', STACEY L. LANDI AND 25 W. HUBBARD, INC., D/B/A SOCIAL 25**
**MOTION TO EXCLUDE EXPERT TESTIMONY AND REPORT OF**
**DOUGLAS H. SELL, JR.**

---

*TABLE OF CONTENTS*

Page

INDEX OF CASES, STATUTES, AND OTHER AUTHORITIES.............................................2

I.    INTRODUCTION.................................................................................….... 3

II.   STANDARD OF REVIEW………..……………………………………………....4

III. SELL'S OPINIONS FAIL TO SATISFY THE STRICT REQUIREMENTS OF DAUBERT, KUMHO AND FED. R. EVID 702......................................................................................7

  A.  SELL'S METHODOLOGY TO CALCULATE LOSS OF EARNINGS AND BENEFITS IS NOT SCIENTIFICALLY RELIABLE……………………………………………...7

  B.  SELL IS NOT QUALIFIED TO RENDER AN OPINION ON LOSS OF HOUSEHOLD SERVICES AND EMPLOYS NO SCIENTIFACALLY RELIABLE METHODOLOGY……………………………………………………………… 26

III.  CONCLUSION..................................................................................…...33

V.   RELIEF REQUESTED............................................................................... 34

1

INDEX OF CASES, STATUTES AND OTHER AUTHORITIES

CASES                                                                                              Page

*Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, et al., Case No 12-cv-5836, Memorandum Order and Opinion, United States District Court for the Northern District of Illinois Eastern Division, Judge Robert M. Dow, Jr..................................................32

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011)......................6, 26, 33

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946)..................................................24

*C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015)..........................4, 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).....4, 5, 6, 7, 25, 26, 33, 34

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)......................................................5

*Goldberg v. 401 N. Wabash Venture, LLC*, 755 F.3d 456, 461 (7th Cir. 2014).................6, 32

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)..........................4, 6, 7, 25, 33, 34

*Lapsley v. Xtek, Inc.*, 689 F.3d 822, 805 (7th Cir. 2012)..................................................5

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)................................5

*Nilssen v. Motorola*, 1998 Westlaw 513090, at *14 (N.D. Ill.).......................................23

*Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1068 (5th Cir. 1985)..............................24

*Schultz v. Azko Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)...............................5

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992)................23

*Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)...........................................6

*United States v. Benson*, 941 F.2d 598, 604(7th Cir. 1991)..............................................6

RULES

FED. R. EVID. 702..............................................................................4, 5, 6, 7, 26, 33, 34

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

**COME NOW** Defendants, Stacey L. Landi ("Landi") and 25 W. Hubbard, Inc., d/b/a Social

25, ("Social 25"), in the above-styled case, and file this Motion to Exclude Expert Testimony and

Report of Douglas H. Sell, Jr. (hereafter, "Sell"), and in support thereof show the following:

## I.      **INTRODUCTION**

This matter was properly filed in federal court pursuant to 28 U.S.C. § 1332, diversity of

citizenship existing between the parties. Plaintiff, Jodie Shultz ("Shultz") alleges that on April 12,

2013 she was a business invitee on the premises of Social 25 located at or near 25 W. Hubbard

Street, Chicago, Illinois. Plaintiff's Complaint, ¶11. Shultz alleges that she was occupying a VIP

booth with other members of her party within the Social 25 premises. Plaintiff's Complaint, ¶11. She

alleges that Landi was occupying the adjoining VIP booth, sat up on top of the available seating, fell

over that seating and onto Shultz with the full force of her entire body. Plaintiff's Complaint, ¶12.

Shultz alleges that as a direct and proximate result of Landi's actions, and the failure of Social 25 to

supervise and control the actions of its patron, she suffered serious and permanent injuries and

serious financial loss including the payment of medical bills and expenses. Plaintiff's Complaint,

¶¶24, 31.

At the time of the incident, Shultz had been doing freelance production work for

NotSoldSeparately for a good year. (Deposition of Jodie Shultz, dated October 28, 2015, at p. 13,

lines 10-22, attached as Exhibit A). She started working as an employee of NotSoldSeparately on

April 15, 2013, three days after the incident which is the basis for this action. (Exhibit A, at p. 12,

lines 17-22). Shultz worked for this company on a full-time basis without any limitations from April

15, 2013 through July 2014. (Exhibit A, at p. 122, lines 7-23). During this time period, Shultz was being paid an annual salary of $65,000 with health benefits. (Exhibit A, at p. 43, line 16-p. 44, line 2). **Shultz testified that the reason her employment with NotSoldSeparately ended was that her employer lost a big client, it wasn't because of the incident, and that since July 2014 she has been unable to obtain another full-time position.** (Exhibit A, at p. 122, line 7-p. 123, line 3; p. 168, line 21-p. 169, line 2). (Emphasis added).

Shultz's Complaint alleges single counts of negligence against Landi and Social 25. She has designated Douglas H. Sell, Jr. ("Sell") as a forensic economist expert in this action. This motion seeks to exclude the testimony of Sell at a trial of this action as his proposed testimony does not satisfy the requirements of the *Daubert* standard and Fed. R. Evid. 702.

## II.     STANDARD OF REVIEW

Fed. R. Evid. 702 states:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702 and the Supreme Court decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Charmichael*, 526 U.S. 137 (1999), "provide the legal framework for the admissibility of expert testimony." See *C.W. ex rel.*

4

*Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). "The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 822, 805 (7th Cir. 2012), quoting *Kumho* 526 U.S. at 152 (1999). District courts have broad discretion in determining the admissibility of expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, at 810.

Fed. R. Evid. 702 requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis. *Id*. at 809; see *Daubert* 509 U.S. at 589. "The Seventh Circuit has stressed that 'the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion; the inquiry must focus…solely on principles and methodology, not on the conclusions they generate.'" *Schultz v. Azko Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013); citing *Daubert*, 509 U.S. at 595.

In furtherance of a proper determination of whether expert testimony is admissible, "the district court must ascertain (1) whether the expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)(citing Fed. R. Evid. 702-Adv. Comm. Notes ("[T]he admissibility of all expert testimony is governed by the principle of Rule 104(a). Under that Rule, the proponent has

the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence")).

*Daubert* sets forth the following non-exhaustive factors for a district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; (4) the theory's level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593-594; see also *Bielskis*, 663 F.3d at 893; *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). "An expert witness is not permitted to parrot what some layperson has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture, LLC*, 755 F.3d 456, 461 (7th Cir. 2014); see also *Benson*, 941 F.2d at 604 ("[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury.")

A witness testifying as to scientific, technical, or other specialized knowledge must be qualified by knowledge, skill, experience, training, or education. Fed. R. Evid. 702. The subject of an expert's testimony must be 'scientific knowledge.'" *Daubert,* 509 U.S. at 579. The Court expressly stated that, "The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* The admissibility of an expert's opinion, therefore, is dependent on its scientific reliability.

### III. SELL'S OPINIONS FAIL TO SATISFY THE STRICT REQUIREMENTS

### OF DAUBERT, KUMHO AND FED.R.EVID. 702

Shultz intends to proffer Sell as a forensic economic expert to testify about her loss of earnings and benefits, and loss of household services at a trial of this action. Sell issued a report in which he sets forth his proposed opinions and the basis for these opinions. (A copy of Sell's report dated November 14, 2016 is attached as Exhibit B). Additionally, Sell provided deposition testimony and was cross-examined extensively on his qualifications, his opinions and the underlying basis for same, as well as the methodology employed in formulating his opinions. On the basis of Sell's report and his deposition testimony, his proposed opinions as to Shultz's loss of earnings and benefits lack the intellectual rigor that characterizes the practice of an expert in the field of forensic economics and fail to satisfy the strict requirements of *Daubert, Kumho* and Fed. R. Evid. 702. Specifically, Sell fails to employ a scientifically reliable methodology which has gained general acceptance within the economic community for the purpose on which he relies on it in formulating his opinions. Further, Sell lacks the qualifications to proffer expert testimony with respect to Shultz's loss of household and employed no scientifically accepted methodology in formulating his opinions. (A copy of Sell's Curriculum Vitae and Addendum is attached as Exhibit C).

### A.   SELL'S METHODOLOGY TO CALCULATE LOSS OF EARNINGS AND BENEFITS IS NOT SCIENTIFICALLY RELIABLE

Sell agrees that the date of Shultz's accident was the evening of April 12th, into the 13th, 2013. (Deposition of Douglas H. Sell, Jr., dated March 22, 2019, at p. 47, lines 17-20, attached as Exhibit D). He agrees that at the time of the accident Shultz was only working as a subcontractor for NotSoldSeparately. (Exhibit D, at p. 47, lines 21-25). Sell further agrees that after the accident,

beginning on April 15, 2013, Shultz became a full-time employee at NotSoldSeparately at an annual salary rate of $65,000. (Exhibit D, at p. 48, lines 1-5; p. 69, lines 6-9).

Sell acknowledges that based upon her federal tax return, the total amount of Shultz's wages and business income for 2010 was $5,983. (Exhibit D, at p. 50, line 7-p. 53, line 17). He agrees that the total of Shultz's earnings in 2011 was $4,316. (Exhibit D, at p. 53, line 14-p. 54, line 11). Sell further agrees that the total of Shultz's earnings in 2012 was $9,601. (Exhibit D, at p. 54, lines 12-24). He acknowledges that Shultz earned wages in the amount of $46,042 in 2013 from April 15, 2013 to December 31, 2013. (Exhibit D, at p. 59, line 5-p. 61, line 16).1 Based on the foregoing, Sell agreed that Shultz's average earning capacity in the three years prior to the date of the accident in this action was between $6,000 and $7,000. (Exhibit D, at p. 64, line 18-p. 65, line 21; p. 68, lines 10-13).

In his report, Sell expressly acknowledges that, "On April 15, 2013, three days after the incident subject to this litigation, Ms. Shultz started working full-time for NSS at a salary of $65,000 annually." (Exhibit B, at p. 1). Notwithstanding the acknowledgment that Shultz's federal tax returns for the years 2010-2012 establish an average annual earning capacity between $6,000-$7,000, **Sell opines in his report that, "I have assumed pre-injury earnings totaled $65,000 annually, which represents the annual salary Ms. Shultz was paid from NSS."** (Exhibit B, at p. 3). (Emphasis added). He further opines that, "Conversely, post-incident earnings were estimated at $12,873 annually; the amount Ms. Shultz achieved in 2015 as a subcontractor." (Exhibit B, at p. 3). Further, "past and future earnings (both pre- and post-incident) were grown 3.05% annually, which represents the 20-year average of the annual hourly wage growth per the Bureau of Labor Statistics ('BLS').

8

Employer-paid fringe benefits were assumed to total 15.2% of past and future pre-incident gross earnings, based on the employer-paid portion for insurance benefits as well as, from the BLS." (Exhibit B, at pp. 3-4). Sell states that Shultz has an average worklife expectancy of 20.25 years, reduced future pre-injury and post-injury calculations to present value at a rate of 4.87%, and opined that "Shultz's estimated earnings loss totals $1,032,764, as shown on Exhibit 1." (Exhibit B, at p. 4).

In Exhibit 1 to Sell's report, he reflects the date of incident as April 12, 2013. He itemizes Shultz's "pre-injury earnings" in the amount of $65,000 annually, and itemizes her "post-injury earnings" as $12,873 annually. (Exhibit B, at Exhibit 1 to Sell report). Sell was cross-examined about his "pre-injury earnings" figure of $65,000, which is the lynchpin of his opinion of Shultz's earnings loss and benefits, as follows:

"Q:   How does someone getting a job after the accident equate to her pre-injury earnings? I am not following there.

A:   Well, in this case, she continued to work after the date of the accident and at some point was not capable of performing this position anymore. In my economic loss calculation, it's at that point that I start quantifying damages. So in my model, there's no-- there's no loss calculation starting on the day of April 12th, it's at some point in the future in 2014.

Q:   So you picked a date in the future as to when the lost earnings occurred, future of the injury?

A:   At some—at a date in 2014, that's when her economic loss starts kicking in.

Q:   So you—

A:     She is mitigating her loss from the time of the accident until that time that she's let go from NotSoldSeparately in 2014.

Q:     You would agree that the 15 months following the accident, the plaintiff was earning $65,000 annually?

A:     Yes, that's my understanding.

Q:     And she did that for 15 months?

A:     That's my understanding.

Q:     And she earned about $81,000 over those 15 months?

A:     I have-- I don't have the 2014 return in front of me, but I will take you on your word that that's the total.

Q:     You would agree that the amount that she earned in the 15 months after the accident was a lot greater amount than the three and a half years she earned before the accident?

A:     It is greater-- it is a greater amount, I agree with that.

Q:     Well, for the three years before the accident, she earned about $20,000, and for the 15 months after the accident, she earned $81,000; you agree with that?

A:     I agree."

(Exhibit D, at p. 70, line 5-p. 71, line 22).

Sell further testified as follows with respect to his calculation of Schultz's "pre-injury earnings":

"Q:     Okay. So what you're telling me is that you started your calculation a year or so after the injury?

10

A:   So the calculation theoretically starts the day of the accident, but she's mitigated her income for a period of whatever it was we previously discussed, 15 months, so it's a dollar-for-dollar offset capacity, plus what she earned. Therefore, I start the model—

Q:   But by moving the start of your analysis from the actual date she was injured to the date that you selected, you effectively have moved $81,000 from post-injury earnings to pre-injury earnings; is that true?

A:   It's a dollar-for-dollar offset. I could include them on the pre-injury calculation, but then it would just be subtracted out in the post-injury calculation, her actual earnings that she achieved that mitigate her loss.

Q:   On Exhibit 1 to your report, if your Exhibit 1 had different numbers on the first three lines, pre-injury, post-injury, pre-injury fringe, the bottom line of total estimated earnings loss would be significantly different if the numbers were significantly different; would you agree?

A:   Can you repeat the question—

Q:   Sure.

A:   And be more specific?

Q:   Yes. In Exhibit 1—

A:   --yeah

Q:   -- to your report, the first three items you have there are pre-injury earnings of $65,000, post-injury earnings of $12,873, and pre-injury fringe benefits of 15.2. If those numbers were changed or different assumptions were made, your bottom line number would be significantly different if the numbers were significantly different?

11

A:     They would be different.

Q:     Okay. So if, for example, for pre-injury earnings, you actually did the calculation as of the date of the accident, which is the line right above, where it says, Date of Incident, April 12th, and you put pre-injury earnings of $6,000 to $7,000, because that's what we determined her average earnings for the three and a half years were before, and then for post-injury earnings, you put $65,000, because that's what she was earning for the 15 months after the injury, and then for pre-injury fringe benefits, you put five percent, because that's the amount of pre-injury and that she actually received, because she didn't have those other items of retirement or insurance, then the bottom line would be significantly altered; is that a fair statement?

A:     It would change significantly. I agree with that—

Q:     Okay. And it would be significantly—

A:     -- characterization.

Q:     It would be significantly less or less than zero, correct?

A:     It would be significantly less or possibly zero."

(Exhibit D, at p. 93, line 7-p. 95, line 21; p. 205, lines 9-22).

Based on the foregoing, Sell has manipulated the data by itemizing Shultz's "pre-injury earnings" in the amount of $65,000. The issue at bar in this motion, therefore, is whether he did so based upon a methodology generally accepted within the forensic economic community for evaluating loss of earnings and fringe benefits.

It is undisputed that Sell's report fails to set forth the methodology upon which he relies in formulating his opinions with respect to Shultz's alleged loss of earnings and benefits, inclusive of

12

his determination of "pre-injury earnings" and "post-injury earnings". (See Exhibit A). At his deposition, he was cross-examined about his methodology as follows:

"Q:  I want to talk about your methodology that you just went through with my colleague, in terms of using the post-incident date of August 2014 to assess pre-incident wages, okay?

A:  Okay.

Q:  What specific methodology did you use?

A:  I don't understand the question.

Q:  Okay. Fair enough so Exhibit 7, counsel just walked you through that, correct?

A:  Earnings is Exhibit 8.

Q:  Okay, Exhibit 8. And counsel just spent quite a bit of time and you came over here to our side of the table and walked you through that, correct?

A:  Uh-huh.

Q:  Just for the record, you have to say yes.

A:  Yes. I'm sorry.

Q:  Okay.

A:  It's getting late.

Q:  No, it's no problem. I just want to make sure—it is getting late, but we just all want to have an accurate record. And the question really is, notwithstanding that the accident happened on April 12th or 13th, 2013, you are terming the $65,000 as pre-incident wage earning ability of Ms. Shultz, correct?

A:  Correct.

13

Q: **So my question is, what methodology specifically did you use to come up with that?**

A: **In economic circles, I think the answer to your question is, the methodology is called the yardstick approach.**

Q: And tell me a little bit about what that consists of.

A: The yardstick approach would be, you have a set of data—or you have an assumption, you have a data set, and then you're comparing post-incident, whether it's a slip and fall, which I would classify this as a slip and fall, although some equipment fell on her, or it could be--that methodology could be used in a business setting for lost income, but you're comparing a pre-incident assumption versus a post-incident assumption.

Q: Okay. Can we agree that the incident in this case occurred on April 12th, into the early morning hours of April 13, 2013?

      MR. GAUNCE: I'm going to object to form. Mischaracterizes testimony. You can answer it, if you understand.

      MR. WHITE: Well, let me withdraw the question.

Q: What is your understanding as to the date of the incident which is the basis for this lawsuit?

A: April 12th, into the morning of April 13th.

Q: Of 2013, correct?

A: 2013.

Q: 2013. So that would be the date of the incident?

14

A:   Correct.

…

Q:   This is very straightforward. This lawsuit alleges that Jodie Schultz was injured at the Social 25 Club at the time my client fell on her from an adjoining VIP booth in the late evening hours of April 12, 2013 or the early morning hours of April 13, 2013, correct?

A:   Correct.

Q:   So, therefore, your understanding is that the incident which forms the basis of this lawsuit occurred April 12th and/or April 13, 2013, correct?

A:   Correct.

Q:   Okay. Is it fair to say that if the incident in this case occurred on April 12th or 13th, 2013, that anything pre-incident would be prior to those dates?

        MR. GAUNCE: I'm going to object to the form. Mischaracterizes testimony.

A:   Anything pre-incident would be prior to those dates, sure."

     (Exhibit D, at p. 142, line 19-p. 148, line 6). (Emphasis added).

---

Q:   This yardstick approach that you testified is common in the economic industry, tell me about any peer reviewed literature that you rely on with respect to this yardstick approach.

A:   There's—I feel like this is a guess.

Q:   I don't want you to guess, and neither does counsel. I'm asking you for your personal information and knowledge.

15

A:   There's a publication, Determining—it's called Determining Economic Damages. It's written by a gentleman, Gerald Martin. I'm almost certain that it's—that it is—that methodology is outlined in that publication. If you don't have a copy of it, you might-- it's actually written for attorneys.

Q:   First of all, is that publication peer-reviewed, to your knowledge, or not?

A:   I don't know if it's peer-reviewed. I'm not-- I'm not sure.

Q:   Do you know what year that publication is?

A:   No, not off the top of my head.

Q:   Fair to say that you don't cite anywhere in your report to this yardstick approach that you've just testified that you relied upon in terms of your methodology in determining Ms. Schultz's lost earning capacity?

A:   There's no specific citation to that methodology.

Q:   Okay.

A:   The only thing that would maybe come close is—well, no, I don't-- I was going to say on page 3, is a bullet point, "Various industry and government publications…," but it says, "…cited throughout this report."

Q:   Okay. And there's no specific citation throughout your report which might be subject to that bullet point which refers to the yardstick approach specifically, correct?

A:   That's correct.

Q:   Okay.

A:   That would be just based on my own experience.

16

Q:    Okay. So as I understand it from your testimony just now, Mr. Sell, you're relying on the yardstick approach methodology, yet you don't reference it in your report and you're not certain if there's any peer-reviewed literature that supports this as being acceptable methodology, correct?

A:    I cannot specifically cite anything that I'm aware of that's peer reviewed. And I should qualify that with, I'm assuming Determining Economic Damages by Gerald Martin is--well, could you define peer reviewed?

--

Q:    Okay. So have you ever had any of your work peer-reviewed within the economic community?

A:    I don't-- I've never submitted anything to be critiqued and—

Q:    And accepted by your peers?

A:    --peer reviewed and edited, correct.

--

Q:    Is it fair to say, Mr. Sell, that you've never published any peer reviewed article that has been reviewed and critiqued and accepted by your colleagues in the economic community?

A:    I think that's fair to say. I've never received a critique for anything I've written.

Q:    Okay. This publication that you were talking about just a moment ago, is that a publication you specifically relied upon in utilizing the methodology to determine Ms. Shultz's loss of earning capacity in this case or were you just simply citing that as a peer-reviewed publication?

17

A: I'm citing it as a publication that I've used over the years time and time again if I have a question related to economic damage methodology. We used to call it the Bible.

Q: Okay. So you use it as a reference, but my more specific question is, is that publication something that you specifically relied upon in utilizing the yardstick approach methodology in this case to determine Ms. Schultz's loss of earning capacity or not.

A: It's part of that. It's part of my experience and my training and its part of the equation.

Q: Do you know what the known rate or potential error rate is of the yardstick approach?

A: I do not.

Q: Okay. Do you know whether the yardstick approach that you testified was the methodology you employed in this case to determine Ms. Schultz's loss of earning capacity has gained widespread acceptance within the economic community?

A: The fact that it's mentioned in this publication—I'm almost 100 percent certain it's described in Determining Economic Damages-that would, to me, imply that it is a commonly accepted methodology."

(Exhibit D, at p. 150, line 13-p. 155, line 21).

*Determining Economic Damages* was first published in 1988, and was authored by Gerald D. Martin. When Dr. Martin decided to step aside, Stanley Stephenson and David Macpherson became the authors. (Stanley P. Stephenson, Ph.D. and David A. Macpherson, Ph.D., *Determining Economic Damages*, Revision 26, Forward to 2018 Edition (February 2018), attached as Exhibit E). Chapter 16 of this publication is entitled "Commercial Economic Loss." §1622 addresses "lost profit measurement approaches" and states, "Nancy Fannon (2011) lists four methods to measure lost profits: (1) before/after, (2) yardstick, (3) sales projection, and (4) market model…The so-called

18

'yardstick' method compares the target firm's profits with similarly situated firms, meaning same/similar location, size, industry, etc. Thus the damages practitioners will likely measure losses using one of two methods: 'the before/after approach' or the 'yardstick approach.'" (Exhibit E, at 16-6). Further, [T]he yardstick approach is a cross-section approach in which the analyst examines the profits of similarly situated companies during the damages period. It suggests that a computation of lost profits should be based on a comparison of actual target company profits with a measure of expected profits that reflect economic and market experiences of similar companies." (*Id.*)

As stated, *supra*, Sell testified that he's almost 100 percent certain the yardstick approach methodology is described in *Determining Economic Damages* and that as such, that would imply that it is a commonly accepted methodology. The yardstick approach methodology is mentioned and discussed in some detail in this publication, however, it has absolutely no applicability and is not a proper methodological basis upon which Sell may testify about Shultz's loss of earnings and benefits in this action.

Sell unequivocally confirmed his reliance on the yardstick approach methodology upon examination by Shultz's counsel as follows:

"Q: I'd like to focus on—you mentioned the yardstick approach. Is that an approach you used in calculating lost earnings in this case?

A: Yeah.

Q: And you mentioned—

A: Can I just—

Q: Go ahead.

19

A:    Essentially, this is what you can do or this is what you're capable of doing, and we're comparing what you can do now to the assumption of what you could have done previously.

Q:    According to your understanding, did Ms. Shultz, in terms of her--prior to the August 1, 2014 date that you mentioned, she had 15 months of employment prior to that date?

A:    I believe that's the number we keep throwing around, 15 months, yes.

Q:    And based on your experience and knowledge of this yardstick approach, is a 15-month period adequate in which to provide a basis for calculating economic damages and the yardstick approach?

        MR. WHITE: Objection.

A:    I don't—I don't know. The damage calculation is based--solely on the--on her ability or the fact that she was able to achieve those earnings. It's supported by the fact that, based on her gender, her age, her educational attainment, that women in her cohort, on average, are earning almost the exact same amount. So the 15 months-- the fact that she achieved those earnings in concert with the BLS statistics, so the BLS research, to me, that's really what ties it all together, if that makes sense. That's ultimately what supports it. The 15 months alone I don't believe supports it, or that's what my report would reflect. It's those two things in concert.

Q:    So with those two things in concert, is it your testimony-- looking at those Bureau of Labor statistics that you cited in your report and testified to today, along with Ms.

Schultz's work history, is that adequate, in your experience, under the yardstick approach, to provide a basis to calculate economic damages?

MR. WHITE: Objection.

A:   I believe it is.

Q:   **And was that your basis for calculating economic damages here?**

A:   **Yes."**

(Exhibit D, at p. 212, line 25-p. 214, line 24). (Emphasis added).

Sell produced a computer model for Shultz's lost income and benefits wherein he reflects the "Date of Incident" as April 12, 2013, and the "Date of Loss" as August 1, 2014. (Computer Model, marked as Exhibit 8 to Sell deposition, attached as Exhibit F). He acknowledged that he started calculating Shultz's loss for lost earnings on August 1, 2014 and claims this was because she was able to mitigate her lost earnings for the fifteen month period post-incident. (Exhibit D, at p. 130, line 24-p. 132, line 22; p. 136, lines 3-13). Sell concedes that Shultz had no lost wages for a period of fifteen months, and that within two days from the incident on April 12, 2013 she achieved full-time employment with NSS. (Exhibit D, at p. 136, line 23-p. 137, line 18). It is undisputed that Shultz averaged annual earnings of between $6,000-$7,000 for the three year-plus period prior to April 12, 2013; and that she earned $65,000 for the fifteen months in the immediate aftermath of the incident. Notwithstanding this uncontested evidence, Sell arbitrarily assigns $65,000 as the amount of Shultz's "pre-injury earnings" as the predicate for formulating his calculations of loss of earnings and benefits employing the yardstick methodology. (Exhibit B, at p. 3; Exhibit E).

Sell acknowledged that his reference to "pre-injury earnings" in the computer model

21

refers to the time period before August 1, 2014 and that he selected this as the date of loss because that is when, give or take fifteen days, Shultz lost her job. (Exhibit D, at p. 181, line 12-p. 182, line 15). He testified that August 1, 2014 "was the critical date where she's not mitigating her damages one for one, so in my mind, her financial loss has started the day of the incident. It's just her loss is being mitigated by her ability to work, if that makes sense." (Exhibit D, at p. 206, line 10-p. 207, line 11). Sell acknowledged that the reason his calculation starts on August 1, 2014 rather than April 12, 2013 or April 13, 2013, is that Shultz was simply not experiencing a loss, in terms of her earnings, between those two dates. (Exhibit D, at p. 212, lines 6-13).

Sell was cross-examined about the existence of any evidence of a qualitative change in Shultz's medical condition from the time of the incident on April 13, 2013 to the time of her termination from NotSoldSeparately fifteen months later as follows:

> "Q:   Mr. Sell, what was the specific change in Ms. Shultz's medical condition from the date of the incident in this case, on April 13, 2013, to the day she was laid off by NSS, which impacted her earning capacity?
>
> A:    I don't know that there's any one specific thing. I don't know that there's any one specific thing."

(Exhibit D, at p. 218, line 22-p. 219, line 4).

Sell fails to identify the methodology which he employed in his report. When pressed at his deposition, he unequivocally testified that he employed the yardstick approach methodology to determine that $65,000 was the amount of Shultz's "pre-injury earnings." The salient issues are whether the data upon which Sell relies is reliable and whether the yardstick approach is a

22

scientifically reliable methodology for the specific purpose for which Sell employed it in this action to enable him to testify to a jury.

"For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. *Post hoc ergo propter hoc* will not do nor the enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge." *Nilssen v. Motorola*, 1998 Westlaw 513090, at *14 (N.D. Ill.), quoting *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992). This is precisely what Sell has done in formulating his opinions and the very reason he should not be permitted to testify as an expert at a trial of this action. First, he purposefully itemizes Shultz's "pre-injury earnings" to be coincident with her termination of employment from NotSoldSeparately in August 2014. He "assumed pre-injury earnings totaled $65,000 annually" based on Shultz's full-time salaried employment at this rate of compensation in the fifteen months post-incident on April 13, 2013. In *Nilssen*, the court opined that, "If there is a well-accepted body of learning and experience in the field, then the expert's testimony must be grounded in that learning and experience to be reliable, and the expert must explain how her conclusion is so grounded." 1998 Westlaw 513090, at *11 (excluding damages experts). In *Nilssen*, "the trial court applied Daubert to exclude expert opinion that was 'chock-full of methodological flaws." 1998 Westlaw 513090, at *13.

Notwithstanding Sell's failure and inability to identify any cognizable causally related change in Shultz's medical condition fifteen months post-incident, he has arbitrarily based his economic analysis on the date of her termination rather than the date of the incident. As Sell acknowledged,

*supra*, had he based his economic analysis on the date of the incident, Shultz's loss of earnings and benefits would be significantly less or possibly zero.

It is indisputable that Sell's report fails to identify the methodology upon which he relied in formulating his opinions with respect to Shultz's alleged loss of earnings and benefits. (See Exhibit B). As set forth in detail, *supra*, his deposition testimony unequivocally establishes Sell's reliance upon the yardstick approach methodology in formulating his opinions with respect to Shultz's alleged loss of earnings and benefits. The fatal flaw is that the yardstick approach is not a scientific methodology utilized within the relevant forensic economics community to evaluate loss of earnings and benefits. Rather, it is a methodology which is utilized by a qualified economic expert to analyze the profits of similarly situated companies during the damages period. The very treatise which Sell purportedly relies on and references as "the Bible" confirms this.

The yardstick approach methodology examines the profits of closely comparable businesses in estimating a plaintiff's future profits. *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1068 (5th Cir. 1985). This methodology estimates the plaintiff's lost profits as the plaintiff's actual profits subtracted from the profits of a substantially similar business. (Molly L. Zohn, *How Antitrust Damages Measure Up With Respect to the Daubert Factors*, Geo. Mason L. Rev., Volume 13:3, 697, 703 (2005); citing Michelle Molyneaux, *Quality Control of Economic Expert Testimony: The Fundamental Methods of Proving Antitrust Damages*, 35 Ariz. St. L.J. 1049, 1053, attached as Exhibit G). The Supreme Court accepted this technique in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946). *Id.* at 704, see footnote 63. "The 'yardstick' or 'control group' approach entails comparing the plaintiff's performance to a financial benchmark based on an alternative geographic area, product line, distribution channel, industry, or firm. For example, the 'yardstick' approach may

create a hypothetical 'but-for' scenario in which one assumes that the plaintiff would have obtained

profits consistent with other firms in the same industry." (Jonathan T. Tomlin and David R. Merrell,

*The Accuracy and Manipulability of Lost Profits Damages Calculations: Should the Trier of Fact be*

*Reasonably Certain?*, Transactions: The Tennessee Journal of Business Law, Volume 7, 295, 297,

attached as Exhibit H).

"The yardstick approach involves the identification of a market similar to the one in which

prices were fixed but where prices were unaffected by the conspiracy. A yardstick market should

have cost structures and demand characteristics highly comparable to the cartelized market, lie

outside the orbit of the cartel's influence. Typically, the yardstick method is most useful when

applied to cases of geographically localized price fixing or bid rigging. Markets with non-storable

products, with high transportation costs relative to price, and for localized services are good

candidates for the yardstick method. The yardstick method has been used in markets for bread

(Mueller and Parker, 1992), fluid milk (Porter and Zona, 1999), and construction services." (John M.

Connor, *Forensic Economics: An Introduction with Special Emphasis on Price Fixing*, Journal of

Competition Law and Economics, 4(1), 31, 49, attached as Exhibit I). Sell's opinion as to Shultz's

alleged loss of earnings and benefits is not the product of reliable principles and methods. Sell failed

to establish his methodology within the four corners of his report and only served to compound this

failure by testifying that he employed the yardstick approach which has no applicability to a proper

evaluation of Shultz's alleged loss of earnings and benefits. It is Sell's burden to establish that the

methodology which he employed in this action, for the express purpose for which he relied upon it:

1) has been or is capable of being tested; (2) has been subjected to peer review and publication; (3)

has a known or potential rate of error; and (4) has a level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593-594; *Bielskis*, 663 F.3d at 893. He cannot satisfy this burden.

The subject of an expert's testimony must be "'scientific knowledge'" grounded in the methods and procedures of science. *Daubert* at 579. Sell's opinions fail to satisfy *Daubert, Kumho*, Fed. R. Evid. 702, and the fundamental prerequisite of scientific reliability. Notwithstanding Sell's failure and inability to identify any cognizable causally related change in Shultz's medical condition fifteen months post-incident, he has arbitrarily based his economic analysis on the date of her termination rather than the date of the incident. As Sell acknowledged, *supra*, had he based his economic analysis on the date of the incident, Shultz's loss of earnings and benefits would be significantly less or possibly zero.

Sell testified he utilized the yardstick approach methodology in formulating his opinions with respect to Shultz's alleged loss of earnings and benefits. This is not a scientific methodology utilized within the relevant forensic economic community to evaluate loss of earnings and benefits. Rather, as established *supra*, it is a methodology which is utilized to determine a company's lost revenue based on the performance of comparable or similar "guideline" businesses. Sell cannot sustain his burden of establishing his "assumption" that Shultz's pre-injury earnings totaled $65,000 annually was based on a scientifically reliable methodology. Consequently, Sell's opinions as to Shultz's loss of earnings and benefits fail to satisfy the requirements of *Daubert, Kumho,* and Fed. R. Evid. 702, and his testimony and report should be excluded.

**B.    SELL IS NOT QUALIFIED TO RENDER AN OPINION ON SHULTZ'S LOSS OF HOUSEHOLD SERVICES**

Sell testified that he has never had any training as a vocational rehabilitation expert and

that he is not qualified as a vocational expert. (Exhibit D, at p. 71, lines 23-25; p. 72, lines 1-3). He acknowledged that he is not a CPA and failed to pass any of the four parts of the exam. (Exhibit D, at p. 13, line 3-p. 14, line 9). Sell is likewise not trained or qualified in whether an individual is or is not employable. (Exhibit D, at p. 72, lines 4-7). Sell concedes that he is not qualified to formulate an expert opinion as to whether an individual is employable, able to go back to work or do part-time work, full-time work, or has any type of work restrictions. (Exhibit D, at p. 72, line 23-p. 73, line 5). Although Sell testified he will use information provided by other experts in forming his opinions, it is undisputed that Shultz has not retained a certified vocational counselor, certified life care planner, certified rehabilitation counselor and/or a licensed professional counselor as an expert in this action. Further, Sell has no knowledge of whether Shultz worked at all in 2017 or 2018, or whether she is presently employed. (Exhibit D, at p. 112, lines 2-20). Notwithstanding this, Shultz has tendered Sell to opine about her loss of household services at a trial of this action. (Exhibit B, at pp. 4-6). He was cross-examined about this as follows:

> "Q:   What is the basis upon which you, as an economist, can opine regarding whether someone can or cannot do household services, household chores?
>
> A:   The basis that I used in this analysis was a combination of Ms. Shultz's self-reported abilities or inabilities. I believe there was at least one doctor's report that I relied on. You know, unfortunately, you don't get a check or an invoice or a receipt from anybody when you do the dishes or take out the trash, so a lot of this—the basis of this calculation is her self-reported abilities, medical records. That's the basis."

(Exhibit D, at p. 113, lines9-22).

Sell's report established that his opinions about Shultz's alleged diminished ability to perform household services are premised on: 1) Shultz's subjective feedback; and 2) a couple of notes in medical records of Dr. Leonard Geiger in 2015 and 2016. (Exhibit B, at pp. 4-6). Further, his opinion that Shultz has sustained a permanent loss of ability to perform household-type services is based as follows:

> "Q:   When you come to an opinion about the value of household services, you make the assumption that a permanent loss of the ability to perform household services exists for the plaintiff, correct?
>
> A:   I made that assumption in this calculation.
>
> Q:   Did any medical doctor's note indicate to you that the plaintiff cannot perform household services or she has a permanent loss of the ability to perform household services?
>
> A:   I don't know that I have anything—I don't know that I had anything at the time of this report to—that opined as to permanency.
>
> Q:   Well, you keep saying at the time of this report.
>
> A:   Uh-huh.
>
> Q:   You made your opinions in the report at the time of the report, right? I mean, that seems stupid, but, I mean you made your opinions that she had a permanent loss at the time of the report?
>
> A:   Yes.
>
> Q:   It would be like me saying, I have an opinion, but I'm going to support it by

28

something that happens in the future.

A:   Right, right.

Q:   Okay. You obviously, had an opinion that she had a permanent loss of household services at the time you wrote the report, correct?

A:   Yeah, I explicitly state that in this one sentence in the report, 'given the duration of Ms. Schultz's condition and the fact that I have not been provided with any information indicating Ms. Schultz's current condition is temporary, I have assumed a permanent loss of ability to perform household-type services in her current state, which is discussed in more detail later in this report.' So I have nothing that opines to permanency, whether it's partial and permanent or partial temporary. She hasn't alleged that it's total, so we're just talking partial here, but I have nothing other than her-- I have nothing from a medical perspective that opines on permanency.

Q:   Okay. We're agreed upon that; you don't have a medical report that opines on permanency, correct?

A:   Correct.

Q:   So in your report, basically, you're saying, I don't have a medical note that opines on permanency, therefore, I'm going to assume that she's permanently injured.

A:   That's correct.

Q:   So you took the absence of information to prove that she was permanently disabled?

29

A:    Well, we're looking at her current state. She is lacking the ability to perform household services at her pre-accident levels, self-reported by her. Yes, that's what the assumption is going into the future.

Q:    Okay. So just to be clear, one more time, because you are not provided with information that the plaintiff's condition is temporary, you've assumed that it's permanent?

A:    That's exactly what I have written in the report.

Q:    **Okay. Is that an accepted methodology, to assume that someone has a permanent loss of household services because there's no evidence to say otherwise?**

A:    **I would say it's common."**

(Exhibit D, at p. 117, line 13-p. 120, line 8; Exhibit B, at p. 5). (Emphasis added).

Sell was further cross-examined about his methodology as follows:

"Q:    What generally acceptable or accepted methodology in the community did you rely on to take this position that, not having any information indicating her current condition is temporary, you assumed a permanent loss of ability to perform household services?

A:    I don't know that there's any specific methodology that—I don't know that—I don't know that there is anything that answers your question.

Q:    So is it fair to say that there is no generally accepted methodology that you relied upon in making this statement and coming to this conclusion in your report on page 5 that I just read?

30

A:   I would just say that, generally speaking, it would be the same methodology that I described about earnings, that you have this ability pre-injury and we're going to compare it to what your abilities are post-injury. In this case, it's self-reported on the part of Ms. Shultz.

Q:   But I'm asking specifically, because in order to tender an expert opinion in federal court, you have to base your opinions, in part, on a scientifically reliable and generally accepted methodology. So did you or did you not base this opinion on any such methodology?

A:   My answer would be the same as the earnings, the yardstick approach, that, you know, you have this ability pre-injury and we're now going to compare post-injury what your measurement is.

---

Q:   Would all of the things you said with respect to the yardstick methodology and what you employed here also apply to the household services methodology you used and the opinions that you rendered based on that?

A:   Correct, generally speaking.

---

Q:   I'm asking very specifically about the precise methodology that you employed, and we went through that in terms of your opinions on the loss of earning capacity, and I'm asking the same with respect to your opinions on the diminution and the ability to perform household services?

A:   Yes."

31

(Exhibit D, at p. 176, line 6-p. 178, line 14).

Sell further concedes that his evaluation of the percentage of Shultz's diminished ability, and reduction of household services anywhere from 85-98 percent, is based solely on her own self-reporting statements. (Exhibit D, at p. 121, line 3-p. 123, line 15). "An opinion witness cannot simply vouch for the testimony of a fact witness." *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, et al., Case No 12-cv-5836, Memorandum Order and Opinion, United States District Court for the Northern District of Illinois Eastern Division, Judge Robert M. Dow, Jr. As stated, *supra*, "an expert witness is not permitted to parrot what some layperson has told him and testify that he believes the person was being truthful." *Goldberg* at 461. Further, as contrasted to Sell's arbitrary assignment of the date of loss of August 1, 2014 to Shultz's loss of earnings and benefits, he alternatively selected the date of the incident on April 13, 2013 as the starting point for calculating her loss of household services. (Exhibit D, at p. 129, line 5-p. 130, line 16; Exhibit E). Sell opines that Shultz sustained a loss of household services in the amount of $294,484. (Exhibit B; Exhibit 1 to Exhibit B; Exhibit F).

Sell lacks the qualifications and the requisite "specialized knowledge" to enable him to testify at trial with respect to Shultz's loss of household services. He lacks knowledge, skill, experience, training and education as a certified vocational counselor, certified life care planner, certified rehabilitation counselor and/or licensed professional counselor. (Exhibit D, at p. 13, line 3-p. 14, line 9; p. 71, lines 23-25; p. 72, lines 1-7, line 23-p. 73, line 5; Exhibit C). Sell's opinion about Shultz's loss of household services is not based upon sufficient facts or data and is not the product of reliable principles and methods. His testimony, not predicated upon scientifically reliable data and any applicable cognizable methodology, would not assist the trier of fact to understand the evidence or to

determine a fact in issue." See *Bielskis*, at 893. Consequently, Sell's opinions as to Shultz's loss of household services fail to satisfy the requirements of *Daubert, Kumho* and Fed. R. Evid. 702, and his testimony and report should be excluded.

## IV.    CONCLUSION

Based on the foregoing, the proposed testimony and report of Sell should be excluded, he should not be permitted to testify to a jury at a trial of this action, and enabling him to do so would constitute error. He failed to identify any methodology upon which he relied in formulating his opinions as to Shultz's loss of earnings and benefits in his report. Sell compounded this by unequivocally testifying that he relied upon the yardstick approach methodology which, as demonstrated, pertains to an evaluation of commercial economic damages. Notwithstanding his testimony, Sell clearly did not employ the yardstick approach methodology in this matter, and even if he had, it would have been improper and not a scientifically reliable methodology which has gained general acceptance within the forensic economic community for the purpose upon which he relies on it to formulate his opinions. Consequently, Sell's opinions about Shultz's loss of earnings and benefits are tantamount to "junk science" and would not assist the trier of fact to understand the evidence or to determine a fact in issue." See *Bielskis*, at 893.

Sell lacks the qualifications to proffer expert testimony with respect to Shultz's loss of household services. He is not a certified vocational counselor, certified life care planner, certified rehabilitation counselor and/or licensed professional counselor, and did not rely upon the opinions of any such expert as none have been retained and disclosed by Shultz. Further, Sell employed no scientifically accepted methodology in formulating his opinions about Shultz's loss of household services. His reliance on the yardstick approach methodology, which he didn't employ in any event,

33

is inapposite to a proper evaluation of loss of household services. Sell's opinions about Shultz's alleged diminished ability to perform household services are merely predicated upon Shultz's subjective feedback and a couple of notes in medical records of Dr. Leonard Geiger in 2015 and 2016. Sell's report and testimony establish that he assumes Shultz's condition is permanent based upon the fact he has not been provided with information that it is temporary. This *ipse dixit* assumption is not scientifically reliable. Both Sell's lack of qualifications, and the fact that his opinions about Shultz's loss of earnings and benefits are not predicated upon scientifically reliable data and methodology, fail to satisfy the requirements of *Daubert, Kumho* and Fed. R. Evid. 702, and his testimony and report should be excluded.

## V. <u>RELIEF REQUESTED</u>

Defendants, Stacey L. Landi and 25 W. Hubbard, Inc., d/b/a Social 25, (collectively, "Defendants") respectfully request the following relief:

a. After consideration of the motion, the evidence, and the arguments of counsel, that this Honorable Court grant the Defendants' motion in its entirety, excluding testimony and report of Douglas H. Sell, Jr. consistent with this motion; and

b. That this Honorable Court award any and other such relief to the Defendants as it may deem to be appropriate.

Respectfully submitted,

DEFENDANT,
STACEY L. LANDI,

By: /s/ David A. White
David A. White, Esq.
Registration No. 6323487
One of Her Attorneys
Davis & White, LLC
869 Turnpike Street, Suite 110
North Andover, MA 01845
Phone: (978) 688-1433
Fax: (978) 688-3151
E-Mail: dwhite@daviswhite.com

DEFENDANT,
25 W. HUBBARD, INC. D/B/A
SOCIAL 25,

By: /s/ Robert M. Burke, Jr.
Robert M. Burke, Jr., Esq.
Registration No. 6199396
Heineke & Burke, LLC
120 N. LaSalle St.
Suite 1450
Chicago, IL 60602
Phone: (312) 580-7300
Fax: (312) 580-9200
E-Mail: bburkejr@hcllc.com

Dated: 4/26/19

## **LOCAL RULE 37.2 CERTIFICATION**

Lead Attorney:         David A. White

                                  Davis & White, LLC

Address:                869 Turnpike Street, Suite 110

City:                      North Andover, MA 01845

Phone:                (978) 688-1433

E-Mail:               dwhite@daviswhite.com

I hereby certify that after consultation by means of telephone conference with plaintiff's counsel on April 25, 2019 commencing at 10:00 a.m. CST, and a good faith effort to resolve differences, counsel for defendants Stacey L. Landi and 25 W. Hubbard, Inc., d/b/a, Social 25, is unable to reach an accord on the within motion pursuant to LR 37.2 of the United States District Court for the Northern District of Illinois.

By:                   /s/ David A. White

                            David A. White

## CERTIFICATION OF SERVICE

Lead Attorney:      David A. White
                           Davis & White, LLC
Address:           869 Turnpike Street, Suite 110
City:               North Andover, MA 01845
Phone:           (978) 688-1433
E-Mail:            dwhite@daviswhite.com

I hereby certify that on April 26, 2019, a true and accurate copy of the above document(s) was served upon each party and attorney of record herein by means of the CM/ECF electronic system pursuant to the rules of the United States District Court for the Northern District of Illinois.

By:                  /s/ David A. White
                         David A. White

37

# Appendix

### TO

### DEFENDANTS', STACEY L. LANDI AND 25 W. HUBBARD, INC., D/B/A SOCIAL 25 MOTION TO EXCLUDE EXPERT TESTIMONY AND REPORT OF DOUGLAS H. SELL, JR.

Deposition of Jodie Shultz, dated October 28, 2015…..Exhibit A (1-14).

Expert Report of Douglas H. Sell, Jr. …..Exhibit B (15-21).

Curriculum Vitae and Addendum to Curriculum Vitae of Expert
Douglas H. Sell, Jr. …..Exhibit C (22-24).

Deposition of Douglas H. Sell, Jr., dated March 22, 2019…..Exhibit D (25-100)

Stanley P. Stephenson, Ph.D. and David A. Macpherson, Ph.D., *Determining Economic Damages*, Revision 26, (February 2018)…..Exhibit E (101-105)

Computer Model of Expert Douglas H. Sell, Jr……Exhibit F (106)

Molly L. Zohn, *How Antitrust Damages Measure Up With Respect to the Daubert Factors*, Geo. Mason L. Rev., Volume 13:3, 697, 703 (2005); citing Michelle Molyneaux, *Quality Control of Economic Expert Testimony: The Fundamental Methods of Proving Antitrust Damages*, 35 Ariz. St. L.J. 1049, 1053…..Exhibit G (107-144)

Jonathan T. Tomlin and David R. Merrell, *The Accuracy and Manipulability of Lost Profits Damages Calculations: Should the Trier of Fact be Reasonably Certain?* Transactions: The Tennessee Journal of Business Law, Volume 7, 295, 297…..Exhibit H (145-171)

John M. Connor, *Forensic Economics: An Introduction with Special Emphasis on Price Fixing*, Journal of Competition Law and Economics, 4(1), 31, 49…..Exhibit I (172-200)